# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### AT LOUISVILLE

SHALA REITZ                               **PLAINTIFF**

vs.                         **CIVIL ACTION NO. 3:16-CV-00765-CRS**

FORD MOTOR COMPANY                   **DEFENDANT**

## MEMORANDUM OPINION

### I.      Introduction

This is an employment discrimination case. Plaintiff, Shala Reitz ("Reitz"), brought this law suit against Defendant, Ford Motor Company ("Ford"), alleging: disability discrimination, failure to accommodate her disabilities, age discrimination, gender discrimination, and retaliation. This matter is before the Court on motion for summary judgment by Defendant. DN 42-1. For the following reasons, Defendant's motion for summary judgment will be GRANTED on all claims.

### II.      Legal Standard

Summary judgment is appropriate when the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id*. In undertaking this analysis, the Court must view the evidence in the light most favorable to the non-moving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of proof for establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the…presence of a genuine dispute." FED. R. CIV. P. 56(C)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party also "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

III.     **Factual Background**

Shala Reitz is an hourly employee at Ford Motor Company's Kentucky Truck Plant ("KTP"). DN 42-3 at 8; DN 46-1 at 1. She has been employed at the KTP since 1999 when she started as a Vehicle Assembly Technician. *Id*. In 2002, she developed thoracic outlet syndrome and suffered a torn labrum in her left shoulder. DN 42-3 at 13, 19. When her shoulder reached maximum medical improvement, Reitz's physicians cleared her to work but only with permanent work restrictions. *Id.* at 15–16. These restrictions included no overhead pushing and pulling, no use of vibratory tools, and no overhead work with the left extremity. *Id*.

At the KTP, when an employee has been cleared for work but has workplace restrictions, the Labor Relations Department and the employee work together to find an appropriate position. DN 42-3 at 28; DN 42-4 at 92, 98-99. The employee must first complete a No Work Available ("NWA") form. *Id*. The employee lists the jobs she can do, then returns the form to Labor Relations. *Id*. If Labor Relations is unable to place the employee in a position where they can work safely, the employee is placed on NWA leave and receives short-term disability benefits. *Id*. This

procedure is outlined in the union contract between Ford and United Auto Workers Local 862. DN 43-5 at 63-64. When Reitz returned to work after her shoulder injury, she engaged in this process several times. DN 42-3 at 28. Labor Relations placed her in temporary jobs to accommodate her workplace restrictions. *Id* at 28, 30, 37, 45, 47-49, 56-59.

In late 2012, Reitz suffered a second injury on the job; she injured her right elbow. DN 46-1 at 1. In October of 2013, she underwent her first surgery on her right elbow and went on medical leave. DN 46-1 at 1; DN 42-3 at 29. She returned to work in February 2014 and worked in a temporary position in the "Mod" center. DN 42-3 at 59. In April of 2014, Reitz "bid" into a Material Controller position in the Materials Planning and Logistics ("MP&L") division. *Id.* at 24, 58-59. She worked with "C" crew on Friday and Saturday days, Sunday and Monday nights. *Id*. Reitz asserts that she began to request disability-related restrictions because of her elbow in the spring of 2014. DN 46-1 at 1.

Reitz worked as a Material Controller from April to August 2014. DN 42-7. She underwent a second elbow surgery in October of 2014 and returned to work in April of 2015. *Id*. On or around this time, Reitz asserts that she asked MP&L manager, Chris Tierney, "if there was something that I could do [within the department] to give me some relief." DN 46-1 at 2; DN 42-3 at 167-168. He suggested that she apply for a Process Coach position in the Final Department. DN 42-8 at 8, 30. Also in April of 2015, Reitz worked on discrete projects for MP&L supervisor, Paul Hineman. DN 42-4 at 19-22, 65. These projects included, among others, preparing the MP&L's portion of the annual summer shutdown plan and organizing inventory in the General Stores. *Id*. at 19, 27, 30-37. Her official position remained Material Controller. 42-1 at 3.

By summer of 2015, Reitz asserts she continued to complain about having to work outside her workplace restrictions. DN 46-1 at 1-2. She also asserts she requested a disability accommodation from Steve Hoffman. DN 42-31 at 4-6.

On September 10, 2015, Reitz interviewed for a Process Coach position. DN 42-9 at 44. She did not receive the minimum average score necessary to pass the interview. DN 43-10. Under KTP policy, an employee who fails an interview must wait one calendar year before interviewing for another position. DN 42-9 at 200. Reitz asserts she never knew that she failed the interview and, instead, did not receive the promotion because Ford discriminated against her. DN 46-1 at 6.

On September 12, 2015, Ford assigned Reitz to the Stamping Department. DN 42-3 at 67. Reitz asserts the "press" broke and a team lead told her she could leave early. 42-14 at 1-2; DN 46-1 at 3. She then left the plant and drove to the Buffalo Wild Wings restaurant on Westport Road. DN 42-12; DN 42-13; DN 46-1 at 3. There, she saw Senior Process Coach, David Richardson, Frame/Engine/Tire Team Manager Steve Streicher, and Labor Relations Representative Jake Weimer. *Id*. There is a dispute between the parties as to whether MP&L Supervisor Paul Hineman was with Reitz when she arrived or was already sitting at the table with the other employees. *Id*. Ford proceeded to investigate whether Reitz had been "absent without leave" ("AWOL") from the KTP. DN 42-1 at 8; DN 46-1 at 4.

During the investigation, Paul Hineman refused to answer any questions during the investigation because of his pending divorce. DN 42-9 at 84-89, 96, 109. Process Coach Brett Knipp emailed Labor Relations and said he could not find Reitz at 3:30 p.m. and therefore marked her AWOL for one hour. DN 42-16. On September 25, 2015, Ford disciplined Reitz for being off the job without permission. DN 42-3 at Exhibit 5. She received a reprimand and a balance of shift

penalty. *Id*. Reitz asserts she complained about this discipline because other male workers did not receive the same discipline. DN 46-1 at 4.

On October 22, 2015, Reitz asked Team Manager Mark Burnam to be off work without pay on October 23 and 24 to visit her ill stepfather in Florida. DN 42-17. Burnam approved the request. *Id.* Personnel Supervisor Chuck Hoffman alerted Labor Relations that Reitz's timecard showed she was paid for ten hours of work in the General Stores on the October 23. DN 42-18. Instead of being off work on both October 23 and 24, she had asked MP&L Supervisor Paul Hineman if she could work in the General Stores on the night of October 23. DN 42-3 at Exhibit 8. Ford initiated an investigation into Reitz's shift because it potentially violated the local union contract. DN 42-4 at 146, 152.

On November 20, 2015, Reitz caused an accident while driving a forklift. DN 42-3 at Exhibit 10. Ford disciplined her for poor and careless workmanship the same day and assessed her a balance of shift penalty. *Id*.

On December 4, 2015, Labor Representative James Hoagland interviewed Reitz regarding her shift on October 23. DN 42-3 at Exhibit 8. Reitz told Hoagland that she started at 7 p.m. on the 23rd and had to be at the airport by 4:20 a.m. the next day. *Id.* Hoagland noted it was impossible for her to have made her flight if she worked a full 10-hour shift. *Id*. Reitz responded that she could have if she had "taken all breaks on the end." *Id*. Reitz met with Hoagland again on December 7, 2015. DN 42-3 at Exhibit 6. Hoagland informed Reitz that it was against KTP policy to "take your breaks and lunch out the door." DN 42-3 at Exhibit 6; 42-4 at 26. Finally, Hoagland asked for documentation of Reitz's flight to Florida. DN 42-3 at Exhibit 6. She never provided such documentation. DN 42-3 at Exhibit 7.

On December 9, 2015, Reitz called Ford's Corporate Harassment Hotline. DN 42-19; 46-1 at 5. Reitz alleged the following:

> "…L[abor] R[elations] and management are harassing, bullying & threatening her via ongoing investigations and constant repetitive interviews. She also alleges that she is being treated differently than coworkers (was given AWOL when seen at a Sports Bar after work with other hourly employees who left early were not). She alleges that her ongoing medical issues are also being held against her." DN 42-19.

Sometime between December 9, 2015 and December 17, 2015, Reitz also filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). DN 42-3 at 126; 46-1 at 5-6. Ford received notice of the complaint on December 17, 2015. DN 42-1 at 13. Reitz alleged the discrimination she experienced took place from April 1, 2014 to December 11, 2015. *Id.* In her complaint, she made the following allegations: (1) she asked Management for workplace restrictions starting in April 2014 but her requests were ignored (2) Management assigned her outside of her department to positions that should have been assigned to less-senior employees regularly (3) Labor Relations disciplined her more harshly than her male co-workers (4) Management required her to work in areas that do not meet safety specifications (5) she applied and interviewed for a Management position but was not selected and (6) she told Labor Relations and her supervisors about these conditions but nothing changed. DN 42-3 at Exhibit 13. She claimed this treatment amounted to violations of the American with Disabilities Act ("ADA"), the Age Discrimination and Employment Act ("ADEA"), and Title VII of the Civil Rights act ("Title VII"). *Id.*

On December 15, 2015, Reitz began medical leave; she sought treatment at a local psychiatric hospital for stress and anxiety disorder. DN 42-3 at 119-121, 130. Reitz asserts that she advised Senior Process Coach Sanda Velic she needed a disability accommodation around "Christmastime." DN 42-31 at 4-6. Reitz also asserts that, at some point before January 1, 2016,

Chris Tierney "told [Reitz] that he would have MP&L openings after the first of the year in 2016, which she would be considered for." DN 46 at 14. Reitz asserts Tierney never mentioned these openings to her again. *Id.*

Reitz returned to work, at the earliest, on February 26, 2016. DN 42-20. Reitz was not at work for the first three weeks of March. *Id*. The EEOC filed an official charge of discrimination against Ford on March 29, 2016. DN 42-3 at Exhibit 13. Reitz further asserts she approached Labor Relations in March of 2016 with verbal requests for disability accommodation. DN 42-31 at 4-6.

Reitz requested a personal day for April 1, 2016. DN 46-4. Process Coach Brett Knipp denied her request. DN 42-24. She did not come to work on April 1 and Knipp marked her AWOL. *Id.* Knipp also denied personal days for April 1 for two male employees. *Id.* But, when neither came into work on April 1, Knipp retroactively gave each vacation days instead of marking them AWOL. DN 42-24. Both male employees have seniority over Reitz at the KTP. *Id.* Reitz also asserts she continued to verbally request a disability accommodation from Steve Hoffman at this time. DN 42-31 at 4-6.

On April 8, 2016, Reitz met with Personnel Supervisor Chuck Hoffman as part of the investigation into her hotline complaint. DN 42-18. She repeated her concerns from her hotline and EEOC complaints. *Id*. On April 9, 2016, Reitz went to Building Chairman Rodney Janes and informed him that she had worked through her breaks and was not paid for a shift. DN 46-7. She also told him that she should have been granted a personal day on April 1. *Id*. Janes relayed these concerns to Chuck Hoffman. *Id*.

As part of Ford's investigation into Reitz's hotline and EEOC complaints, senior Labor Relations Representative Lonnie Corkum emailed MP&L Team Managers, David Richardson, Mark Burnam, and Jeff Whyte, and all the Process Coaches and Senior Process Coaches Reitz

worked under since 2014. DN 42-21. Corkum asked whether Reitz had complained about any unfair treatment. *Id.* Corkum specifically asked whether Reitz had raised the following complaints: (1) Reitz had been disciplined more harshly than male co-workers; (2) Reitz had been assigned outside of her workplace restrictions; (3) Reitz had worked in areas that did not meet safety specifications. *Id.* All but MP&L Supervisor Paul Hineman responded that they had no knowledge of any complaints. *Id.*

On April 21, 2016, Senior Labor Relations Representative Christina Peace emailed Labor Relations Representative James Hoagland and told him to discipline Reitz for leaving her shift early on October 23, 2015. DN 46-11. On April 25, 2016, Peace emailed Suzie Furton in the Equal Employment Planning Department and asked whether she should inform the EEOC investigator that Reitz would be disciplined for being off the job without permission. DN 46-8. Furton responded that she should not contact the investigator. *Id.* On May 10, 2016, Ford disciplined Reitz for leaving her shift early on October 23, 2015. DN 42-3 at Exhibit 7. She received a reprimand and a balance of shift penalty. *Id.*

In the spring of 2016, Ford continued to investigate Reitz's hotline complaint. *See* DN 42-22; DN 42-23; DN 42-24. Labor Relations interviewed Brett Knipp, Sanda Velic, and Paul Hineman. *Id.* During the Summer of 2016, Reitz asserts she verbally requested a disability accommodation from Sanda Velic and Chris Johnson. DN 42-31 at 4-6.

Reitz requested a personal day for October 4, 2016; Senior Process Coach Sanda Velic denied the request. DN 46-10. Chuck Hoffman emailed Christina Peace and said Reitz's request should have been approved. *Id.* On October 10, 2016, Reitz provided documentation to KTP's Medical Department for a third surgery on her right elbow; she went on medical leave and received workers' compensation benefits. DN 42-25. Bonnie Ross, RN, from the Medical Department,

contacted Reitz's treating physician regarding her medical leave. DN 42-27. He informed Ross that Reitz could work if she did not use her right arm. *Id*. Ford called Reitz back to work on or about November 7th, 2016 and placed her in a temporary administrative position in the General Stores. DN 42-3 at 9-10, 140-143; DN 42-4 at 207; DN 46-1 at 6-7. The position met her workplace restrictions. DN 42-3 at Exhibit 16.

On November 15, 2016, Personnel Supervisor Chuck Hoffman met with Reitz to close the investigation into her hotline complaint. DN 42-28. She stated the harassment she experienced had continued and that she felt threatened and watched. *Id*. Hoffman asked Reitz to provide him with details about who was harassing and threatening her. *Id*. Reitz declined and said all requests for that information should go through her legal counsel. *Id*.

Labor Relations learned Reitz complained to the Medical Department that she could not work because of her elbow on November 21, 2016. DN 42-29. This complaint was the first time Labor Relations knew Reitz had complained about her workplace restrictions. DN 42-4 at 207-208. On or around this time, Reitz spoke to Building Chairman Rodney Janes. Janes told her that she was being treated "differently" than her coworkers and that she was subject to "two sets of rules." DN 46-1 at 7.

On November 28, 2016, Personnel Supervisor Chuck Hoffman met with Reitz again to close out the investigation into her hotline complaint. DN 42-3 at Exhibit 16. She declined to answer any questions about the harassment or threats she experienced and referred all such questions to her counsel. *Id*. November 29, 2016 was Reitz's last day at work before she went on medical leave for her third elbow surgery. DN 46-1 at 7. She underwent surgery on December 8, 2016 and has not returned to work. *Id*. She is still employed by Ford. DN 42-1 at 20.

Intermittently between May 5, 2016 and December 12, 2016, KTP employees Christina Peace, Dennis Devore, John Alkire, Raymond Hart, Mary Bobay, and Chuck Hoffman sent emails regarding Reitz's medical leave and medical report. DN 46-6. The discussion involved questions of why Reitz was absent from work, whether Reitz was on medical leave and whether she received workers' compensation. *Id*. Further, the employees discussed Reitz's workplace restrictions when she returned to work on or about November 7, 2016. *Id*.

IV.     **Procedural History**

Reitz filed this suit in Jefferson County Circuit Court on October 28, 2016. DN 1-2. Ford filed a notice of removal with this Court on December 2, 2016. DN 1. The suit was removed, and Ford filed an answer on December 12, 2016. DN 4. Reitz filed a motion for leave to amend her complaint and join parties as defendants on November 30, 2017. DN 18. Ford opposed this motion on January 4, 2018. DN 21. Prior to any ruling on the motion by this Court, Reitz withdrew her motion for leave. DN 28. Ford filed this motion for summary judgement on February 28, 2019. DN 42.

V.     **Discussion**

In her Complaint, Reitz brings three substantive claims. *See* DN 1-2. First, she claims Ford violated the Kentucky Civil Rights Act ("KCRA") and ADA by repeatedly and willfully failing to provide her with reasonable accommodation for her disabilities and discriminating against her because of her disabilities. DN 1-2 at 5. Second, she claims Ford violated the KCRA, Title VII, and the ADEA by discriminating against her because of her age and gender. DN 1-2 at 6. Third, she claims Ford violated the KCRA, Title VII, the ADEA, and the ADA by retaliating against her after she engaged in protected activities. DN 1-2 at 8.

A.     **Disability Discrimination, Failure to Accommodate, Age Discrimination and Gender Discrimination Claims**

Ford asserts that Reitz's disability discrimination, failure to accommodate, age discrimination, and gender discrimination claims fail as a matter of law. DN 42-1 at 21-22, 26, and 30. Reitz does not address these arguments in her response. *See* DN 46. Instead, Reitz argues that she "believes that the proof supports her claims against Ford for retaliation…Plaintiff's response addresses that category of claims." DN 46 at 9.

A non-moving party waives an argument by failing to address the argument in its response brief. *See e.g. Keys v. Dart Container Corp.* No. 1:08-CV-138-JHM, 2012 WL 2681461, at *7 (W.D. Ky. July 6, 2012). Reitz waived her argument against Ford's motion for summary judgment on the disability discrimination, failure to accommodate, age discrimination, and gender discrimination claims by not addressing Ford's arguments in her response. Therefore, the Court will grant Ford's motion for summary judgment on these claims.

### B.    Retaliation Claim

Reitz asserts that she was "subjected to escalating adverse actions by the Ford because she engaged in activity protected under the KCRA, Title VII, the ADEA, and ADA." DN 1-2 at 8–9. Under Title VII, the ADEA, and ADA a plaintiff may establish retaliation by introducing direct or circumstantial evidence. *Rorrer v. City of Stow,* 743 F.3d 1025, 1046 (6th Cir. 2014); *Daquilla v. Brennan,* No. 5:15-CV-175-TBR, 2017 WL 4542977, at *8 (W.D. Ky. 2017) (quoting *Imwalle v. Reliance Med. Products, Inc.,* 515 F.3d 531, 543 (6th Cir. 2008)). When the plaintiff only produces circumstantial evidence, as in this case, the court applies the burden-shifting framework established in *McDonnell Douglas. McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Rorrer,* 743 F.3d at 1046; *Daquilla,* WL 4542977 at *8 (quoting *Morris v. Oldham Co. Fiscal Court*, 201 F.3d 784, 792). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in protected activity,

(2) the defendant knew of the exercise of that protected right, (3) an adverse action was subsequently taken against the plaintiff, and (4) there was a causal connection between the protected activity and adverse action. *McDonnell Douglas Corp.,* 411 U.S. at 801–05; *Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 435 (6th Cir. 2009).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp.,* 411 U.S. at 801–05; *Hamilton v. Gen. Elec. Co.,* 556 F.3d 428, 435 (6th Cir. 2009); *Daquilla,* WL 4542977 at *8 (quoting *Imwalle,* 515 F.3d at 544). If the defendant meets this burden, the plaintiff must then demonstrate that the reason offered by the defendant was a pretext for unlawful retaliation. *McDonnell Douglas Corp.,* 411 U.S. at 804; *E.E.O.C. v. Ford Motor Co.,* 782 F.3d 753, 767 (6th Cir. 2015). Ultimately, the burden of persuasion remains with the plaintiff throughout the burden-shifting framework. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The KCRA prohibits employers from retaliating against employees who file a discrimination complaint. Ky. Rev. Stat. Ann. § 344.280; *White v. Coventry Health and Life Ins. Co.,* 680 Fed.Appx. 410, 413–414 (6th Cir. 2017). Retaliation claims under the KCRA are evaluated under the same standard as federal law. *Hamilton*, 556 F.3d at 435. Therefore, the *McDonnell Douglas* burden shifting analysis applies to Reitz's retaliation claim under the KCRA.

When analyzing a retaliation claim under on summary judgment, the court must first determine whether the plaintiff has established her prima facie case. *E.E.O.C. v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997). This is the first stage of proof under the *McDonnell Douglas* framework. *Id.* The plaintiff's burden to establish a prima facie case of retaliation "is not onerous." *Id*. Indeed, all that is required of the plaintiff at this first inquiry is to "demonstrate that [she] has a case, that the evidence is on h[er] side." *Id*. If the plaintiff meets this burden, she creates

a rebuttable presumption that the defendant unlawfully retaliated against her and the defendant must proceed with its case. *Id.* (quoting *Burdine*, 450 U.S. at 254). Therefore, the Court will consider whether Reitz has presented sufficient evidence to establish each element of her prima facie case.

### a. Elements I and II: Protected Activities and Notice

It is undisputed by the parties that Reitz engaged in two instances of protected activity. DN 50 at 5. First, on December 9, 2015, Reitz called Ford's internal Corporate Harassment Hotline. DN 42-19; 46 at 5. Second, sometime between December 9, 2015 and December 17, 2015, Reitz filed a complaint with the EEOC. In each, Reitz stated she was experiencing discrimination based on her age, gender, and disabilities. DN 42-3 at 126; DN 46 at 5-6. Ford knew about each protected activity. DN 50 at 5.

Reitz also asserts that she "began to request work appropriate for her disabilities, and to complain about the company's refusals" prior to her hotline complaint. DN 46 at 11. These "verbal reports" allegedly began in the spring of 2014 and continued throughout 2015. *Id.* Further, Reitz argues that these "verbal reports" constituted a request for accommodation and were protected under the ADA. *Id.* Finally, she asserts that her complaints about other employees "receiving more favorable treatment on account of age and gender" were protected under Title VII and the ADEA. *Id.* The question for the Court is whether these "verbal reports" and complaints constitute protected activity under the ADA, Title VII, and the ADEA.

### i. Protected Activity Under the ADA

The ADA provides that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The anti-retaliation provision is not a catchall for any type of workplace retaliation; the activity must be covered by the ADA. *Id.; Rorrer*, 743 F.3d at 1046. The Sixth Circuit has held that requesting an accommodation because of a disability is a protected activity under the ADA. *Bryson v. Regis Corp.,* 498 F.3d 561, 577 (6th Cir. 2007); *Rorrer*, 743 F.3d at 1046*; Neely v. Benchmark Family Services*, 640 Fed.Appx. 429, 437 (6th Cir. 2016). Therefore, the question for the Court becomes whether the "verbal reports" Reitz made from the spring of 2014 to 2015 constitute a request for accommodation under the ADA.

In failure to accommodate claims under the ADA, a plaintiff must show, along with other factors, that she requested an accommodation. *Judge v. Landscape Forms Inc.,* 592 Fed.Appx. 403, 407 (6th Cir., 2014). There is no bright line test to determine whether the form of an employee's request was "sufficiently clear to constitute a request for an accommodation." *Id.* The employee does not have to "use the magic words 'accommodation' or even 'disability." *Id.* But, "the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id*. Further, "an employee who contends that he is otherwise qualified with a reasonable accommodation bears the initial burden to propose an accommodation and show that the accommodation is objectively reasonable." *Cash v. Siegel-Roberts, Inc.,* 548 Fed.Appx. 330, 335 (6th Cir. 2013).

The Sixth Circuit has held that a plaintiff's failure to abide by her employer's reasonable accommodation policies precludes finding a prima facie case of discrimination. *Burns v. Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 258 (6th Cir. 2000); *Lockard v. Gen. Motors Corp.,*52 Fed.Appx. 782, 786. In *Burns*, the court held that the plaintiff failed to establish a prima facie case of discrimination because he never requested a transfer to a new position. *Burns*, 222 F.3d at 258.

The defendant had a non-discriminatory policy that required employees to apply for a job transfer within their restrictions. *Id.* The court stated that allowing the plaintiff to recover when he failed to abide by the defendant's non-discriminatory policy would "convert a nondiscrimination statute into a mandatory preference statute, a result which would be inconsistent with the nondiscriminatory aims of the ADA." *Id.* (quoting *Dalton v. Subaru-Isuzu Auto., Inc.,* 141 F.3d 667, 679 (7th Cir. 1998)).

In *Lockard*, the Sixth Circuit held that the plaintiff also failed to establish a prima facie case of discrimination because she failed to "submit to the necessary procedures" for requesting an accommodation. *Lockard*, 52 Fed.Appx. at 786. The plaintiff previously secured an accommodation by filing a grievance in accordance with the employer's procedures but refused to file a second. *Id.* at 787. The court stated "[the defendant] had already accommodated Lockard's disability, and was not required to provide further accommodations absent Lockard requesting further accommodation." *Id.*

Here, Reitz suffered a left shoulder injury in 2002. DN 42-3 at 13, 19. Reitz's physicians cleared her to return to work but only with permanent workplace restrictions. Reitz requested and received numerous temporary positions to accommodate her restrictions. *Id.* at 15–16. Her deposition testimony shows she understands the NWA accommodation process; she did it "several times throughout the left shoulder injury." *Id.* at 28. Further, when Ford could not find work for Reitz to do safely in the plant, she went on NWA leave and collected short-term disability benefits. *Id.* This process is also outlined in the Local Agreements Between Ford Motor Company and UAW Local 862. DN 43-5 at 63-64.

Reitz claims her "verbal reports" beginning in the spring of 2014 and continuing throughout 2015 constitute a request for accommodation. DN 46 at 11. But, Reitz presents no

evidence that she used the NWA process to request an accommodation after her first elbow injury. In fact, despite her first elbow surgery, she "bid" on the Material Controller position in April of 2014. DN 42-3 at 59. If Reitz was unable to work in that position, she knew the process to find a different position that would accommodate her. She chose not to avail herself to that process. The record shows that Ford's Labor Relations Department did not know of the Reitz's verbal complaints until November 21, 2016. DN 42-4 at 207-208; DN 42-29.

In sum, Reitz is an experienced employee with a long history of workplace restrictions. She understood Ford's NWA accommodation process and had frequently taken advantage of it to obtain appropriate work after her shoulder injury. She chose not to follow that process here. As in *Lockard,* Reitz "failed to trigger the appropriate mechanism by which she could obtain an accommodation." *Lockard,* 52 Fed.Appx. at 787. The Court finds that Reitz's "verbal reports" do not constitute a request for accommodation under the ADA because she knew the necessary procedures through which she could request a reasonable accommodation and did not follow them.

Because Reitz did not make a request for a reasonable accommodation, she also did not engage in a protected activity under the ADA. Therefore, Reitz has not established that she engaged in protected activity under the ADA prior to her hotline complaint.

## ii. Protected Activity Under Title VII and the ADEA

Reitz claims she complained about other employees "receiving more favorable treatment on account of age and gender" and therefore opposed an unlawful employment practice. DN 46 at 11. Under Title VII and the ADEA it is unlawful "for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner

in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).[1]

The Court does not reach the question of whether Reitz's complaints constituted protected activity because the record is devoid of any evidence that she raised these complaints before her hotline complaint (the first undisputed instance of protected activity). The only support Reitz provides is her affidavit which states "I complained about the men being treated more favorably than I was in the AWOL [Buffalo Wild Wings] incident…I also complained that younger and non-disabled workers were receiving more favorable treatment. I made these complaints throughout the fall of 2015, verbally, and nothing was done to investigate them." 46-1 at 4–5. Title VII does not protect an employee if her opposition is merely a "vague charge of discrimination."[2] *Land v. Southern States Coop., Inc.* 740 Fed.Appx. 854, 850 (6th Cir. 2018) (quoting *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989)). Without more support, Reitz cannot show that her complaints about other employees "receiving more favorable treatment on account of age and gender" are protected activities under Title VII or the ADEA. Accordingly, the Court finds Reitz did not engage in any protected activity under Title VII or the ADEA prior to her hotline complaint.

### b. Element III: Materially Adverse Action

---

[1] The ADEA's anti-retaliation provision is nearly identical to Title VII's: "It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d).

[2] Plaintiff cites no case law that shows the ADEA anti-retaliation provision has a lower standard than Title VII. Accordingly, the Court treats each statute as having the same standard.

Reitz asserts that her discipline on May 10, 2016 for being off the job without permission is a materially adverse action. DN 46 at 18. Ford admits this discipline occurred after Reitz's hotline complaint. DN 50 at 10. In addition, Plaintiff asserts that she experienced three other materially adverse actions because of her hotline complaint and EEOC complaint. First, she was "subjected to a period of incredible scrutiny, where the company took hours to ask about her relationships, her Facebook posts, and even her divorce pleadings." DN 46 at 12. Second, she experienced a hostile work environment. *Id.* at 13. Third, Ford unlawfully disclosed her medical information. *Id* at 15.

To establish a prima facie case of retaliation, a plaintiff must show that the "challenged action" taken by her employer was "materially adverse." *Burlington N. and Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006). A challenged action is materially adverse if it would have "dissuaded a reasonable worker form making or supporting a charge of discrimination." *Id*. This is an objective standard. *Id*. Title VII's retaliation provision does not protect against trivial harms or set forth a "general civility code for the American workplace." *Id.* Materially adverse actions do not include "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.; Cecil v. Louisville Water Co.,* 301 Fed.Appx. 490, 501 (6th Cir. 2008).

A materially adverse action must occur *after* an employee engages in a protected activity to satisfy the third element. *Daquilla,* WL 4542977, at *10; *Marshall v. Super Service, LLC,* No. 6:14-229-DCR, 2016 WL 1389595, at *13 (W.D. Ky. 2016); *Wimsatt v. Kroger Co.,* No. 3:14-CV-712-CRS, 2015 WL 3622336, at *3 (W.D. Ky. 2015). Therefore, the Court will only consider the record between Reitz's call to the corporate harassment hotline on December 9, 2015 and her last day of work on November 29, 2016.

### i. Increased Scrutiny

Reitz asserts that she was "subjected to a period of incredible scrutiny, where the company took hours to ask about her relationships, her Facebook posts, and even her divorce pleadings." DN 46 at 12. In *Hill,* the Sixth Circuit held that a reasonable jury could have found that the plaintiff suffered a materially adverse action because he was subjected to heightened scrutiny by his supervisor. *Hill v. Nicholson,* 383 Fed.Appx. 503, 512–513 (6th Cir. 2010). By "nitpicking" the plaintiff and changing the plaintiff's performance standards, the supervisor "created an environment in which [the plaintiff] was constantly exposed to the risk of failure, and a reasonable employee might understandably choose to forgo filing a complaint rather than be exposed to such conditions." *Id.*

Reitz's alleged period of increased scrutiny is limited because of her extended absences from work. After her hotline complaint, Reitz began a period of medical leave on December 15, 2015 and sought outpatient treatment at a local psychiatric hospital. DN 42-3 at 119-121, 130. She did not return to work until, at the earliest, February 26, 2016, and was absent from work for most of March. DN 42-20. On October 10, 2016, Reitz informed Ford's Medical Department that she needed a third surgery and needed medical leave. DN 42-25. On or about November 7, 2016, Ford recalled Reitz to work in an administrative position in the General Stores. DN 42-3 at 9-10, 140-143; DN 42-4 at 207; DN 46 at 6-7. November 29, 2016 was Reitz's last day of work; DN 46 at 7. In sum, Reitz could only have experienced increased scrutiny from late March 2016, to October 10, 2016, and from November 7, 2016 to November 29, 2016.

The instances where Ford questioned Reitz are similarly limited. On April 8, 2016, Reitz met with Personnel Supervisor Craig Hoffman to discuss her hotline complaint. DN 42-18. Based on this interview, Ford's Labor Relations Department independently investigated Reitz's hotline complaint by interviewing several employees. *See* DN 42-21; DN 42-22; DN 42-23; DN 42-24.

On November 15, 2016, Chuck Hoffman met with Reitz a second time about the hotline complaint. DN 42-28. On November 28, 2016, they met again to close out her the hotline complaint. DN 42-3 at Exhibit 16.

In sum, the increased scrutiny after Reitz's hotline complaint consisted of three interviews over approximately seven months. Importantly, Ford did these interviews to investigate Reitz's claims in her hotline complaint. Reitz's assertion that these interviews constituted a materially adverse action would force this Court to conclude that Ford's investigatory response to Reitz's hotline complaint is also sufficient to show retaliation for her hotline complaint. Reitz cannot have it both ways. The Court finds that three meetings, related to Reitz's claims of discrimination, over approximately seven months would not have dissuaded a reasonable worker from making a charge of discrimination. Therefore, the Court finds that Reitz has failed to produce sufficient evidence that the alleged period of increased scrutiny constituted a materially adverse action.

### ii. Hostile Work Environment

Reitz asserts that Ford created a hostile work environment as retaliation for her hotline complaint and her EEOC complaint. DN 46 at 13. She cites no case law where a hostile work environment met the materially adverse action standard set forth in *White*. Regardless, the evidence Reitz cites to support a hostile work environment would not have dissuaded a reasonable worker from making a charge of discrimination.

Reitz cites the following as evidence of a hostile work environment: (1) Brett Knipp denied her personal day for April 1, 2016 and marked her AWOL, but he gave two other, male, more senior, members of her team vacation (DN 46-4); (2) she told Rodney Janes that she worked through her breaks on April 8, 2016 but was not paid for her breaks (DN 46-7); (3) Christina Peace asked Suzie Furton whether it was appropriate to inform the EEOC investigator that Reitz would

be disciplined for being off the job without permission (DN 46-8); (4) Chris Tierney told Reitz there would be job openings in 2016 but never discussed them again with her (DN 46 at 14); (5) Sanda Velic mistakenly denied her a personal day on October 4, 2016 (DN 46-10); and (6) Rodney Janes told Reitz that she was being treated "differently" and subjected to "two sets of rules." DN 46-1 at 7.

Materially adverse actions under Title VII are not "petty slights or minor annoyances that often take place at work and that all employees experience." *Cecil,* 301 Fed.Appx. at 501. Here, Reitz directly experienced four of the six examples of the alleged hostile work environment: (1) the denied personal day for April 1, 2016 (2) "work[ing] through her breaks" once (3) Chris Tierney telling her there would be job openings available in 2016 and (4) the denied personal day for October 4, 2016. These are quintessential examples of "petty slights or minor annoyances" that employees experience in the workplace. No reasonable worker would have been dissuaded from making a charge of discrimination based on those actions. Therefore, the Court finds that Reitz has failed to produce sufficient evidence that the alleged hostile work environment constitutes a materially adverse action.

### iii. Disclosure of Medical Information

Reitz asserts that the internal disclosure and discussion of her medical information amongst six KTP employees was a materially adverse action. DN 46 at 15. Again, she cites no case in which the disclosure of an employee's medical information was found to be a materially adverse action for a retaliation claim. The Court declines to affirmatively adopt this unsupported assertion. Further, even if there was case law to support Reitz's contention, no reasonable employee would be dissuaded from making a charge of discrimination based on the evidence she cites.

Reitz cites to an email chain in which Reitz's medical information is discussed. DN 56-6. There are six employees included throughout the chain. Of the six employees, three, Christina Peace, John Alkire and Chuck Hoffman, are from Labor Relations, two, Dr. Raymond Hart and Mary Bobay, R.N., are from the Medical Department, and one, Dennis Devore, is Ford's workers' compensation claims handler. *Id*. Ford accurately describes the chain's contents. *See* DN 50 at 8–10. The employees discuss "what kind of leave [Reitz] is on; whether it was medically supported; whether an independent medical examination should be obtained; when [Reitz] could be expected to return to work; and whether [Reitz's] medical bills were being paid through workers' compensation." *Id*.

Reitz only became aware of the email chain during this litigation. DN 46-1 at 7. A reasonable employee would not be dissuaded from making a charge of discrimination based on an email conversation that she has never seen. Further, Reitz's medical leave necessitated this conversation. It is unreasonable for an employee to go on medical leave expect their employer not to discuss her medical situation. Therefore, the Court finds that the email chain is insufficient to establish a materially adverse action.

### iv. Discipline for October 23, 2015 Shift

It is undisputed that Ford disciplined Reitz on May 10, 2016. DN 50 at 10; DN 42-3 at Exhibit 7. The discipline stemmed from the investigation into her shift on October 23, 2015. *Id*. She received a reprimanded and a balance of shift penalty. *Id*.

Write-ups and disciplinary actions qualify as material adverse actions under the *White* standard. *Marshall,* WL 1389595, at *13. Therefore, the Court finds that Reitz's discipline is sufficient to establish a single materially adverse action that took place after Reitz's hotline complaint.

### c. Element IV: Causal Connection

If a plaintiff establishes that she suffered a materially adverse action, she must then establish a causal connection between the protected activity and the materially adverse action. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *Daquilla,* 2017 WL 4542977, at *9 (quoting *Michael v. Caterpillar Fin. Servs. Corp.,* 496 F.3d 584, 596 (6th Cir. 2007)). Temporal proximity between the protected activity and materially adverse action alone is insufficient to establish a causal connection for a retaliation claim. *Id.* (quoting *Michael*, 496 F.3d at 596). "Rather, where the plaintiff relies on temporal proximity, it must be accompanied by "other indicia of retaliatory conduct" in order to support a finding of a causal connection." *Id.*

Further, the Sixth Circuit has held that an employee failed to present a causal connection between his protected activity and his termination because the employer had "already begun to consider terminating [the employee] several days before" he engaged in protected activity. *Land*, 740 Fed.Appx. 854 at 850. In *Land*, the plaintiff sent letters to his supervisors where he complained of discrimination and a hostile work environment. *Land*, 740 Fed.Appx. At 847. He was fired eleven days later. *Id.* Plaintiff argued that the proximity between the letters and his termination was sufficient to establish a causal connection. *Id.* At 850. But, the defendant had "already begun considering terminating Land several days before he submitted the letter." *Id.* Therefore, the court found that the plaintiff failed to present a causal connection between his protected activity and the materially adverse action. *Id.*

Here, Ford began the disciplinary process before Reitz engaged in a protected activity. DN 42-3 at Exhibit 8; DN 42-3 at Exhibit 6. James Hoagland interviewed Reitz on December 4, 2015 regarding her shift on October 23, 2015. DN 42-3 at Exhibit 8. She participated in a follow up

interview with James Hoagland on December 7, 2015. DN 42-3 at Exhibit 6. Reitz's hotline complaint occurred on December 9, 2015. As in *Land*, there cannot be a causal link between protected activity and an adverse action when the employer was already considering the adverse action prior to the protected activity. The protected activity must be the impetus for the materially adverse action.

The Court finds that Reitz has failed to provide sufficient evidence to establish a causal connection between her hotline and EEOC complaints and her discipline on May 10, 2016. As a result, she has failed to establish her prima facie case of retaliation. Her claim fails as a matter of law. The Court will grant Ford's motion for summary judgment as to the retaliation claim.

## VI. Conclusion

For the reasons stated herein, a separate order will be entered this date granting summary judgment in favor of Ford Motor Company.

**IT IS SO ORDERED.**

September 25, 2019

**Charles R. Simpson III, Senior Judge**
**United States District Court**